UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| DANIEL HIMMEL, Derivatively on Behalf of BEST BUY CO., INC., | ) ) ) | Case No. |
| Plaintiff, | ) ) | VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR |
| vs. | ) ) ) | VIOLATIONS OF THE EXCHANGE ACT OF 1934, BREACH OF |
| BRIAN J. DUNN, JAMES L. MUEHLBAUER, RICHARD M. SCHULZE, MATTHEW H. PAULL, HATIM A. TYABJI, KATHY J. HIGGINS VICTOR, RONALD JAMES, ROGELIO M. REBOLLEDO, GEORGE L. MIKAN III, GÉRARD R. VITTECOQ, SANJAY KHOSLA, LISA M. CAPUTO, BRADBURY H. ANDERSON, ALLEN U. LENZMEIER, ELLIOT S. KAPLAN, and FRANK D. TRESTMAN, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT |
| Defendants, | ) ) | |
| -and- | ) ) ) | |
| BEST BUY CO., INC., a Minnesota corporation, | ) ) ) ) | |
| Nominal Defendant. | ) ) ) | DEMAND FOR JURY TRIAL |

## NATURE AND SUMMARY OF THE ACTION

1.    This is a verified shareholder derivative action brought by plaintiff, a shareholder of Best Buy Co., Inc. ("Best Buy" or the "Company"), on behalf of the Company against certain of its officers and directors.  This action seeks to remedy the defendants' violations of federal securities laws, and state law claims for breach of fiduciary duty, waste of corporate assets, and unjust enrichment that have caused substantial monetary losses to Best Buy and other damages, such as to its reputation and goodwill.

2.    Best Buy is a multinational retailer of consumer electronics, home office products, entertainment software, appliances, and related services.  The Company operates in two segments: domestically (in the U.S.) and internationally, with the majority of its sales derived from its domestic operations.

3.    This action arises out of the Individual Defendants' (as defined herein) improper statements concerning the Best Buy's financial results and business prospects which caused the Company to incur significant damages, including losing over $6.3 billion in market capitalization.

4.    From March 25, 2010 to December 14, 2010, the Individual Defendants caused the Company to issue improper statements in its press releases and conference calls that touted the Company's positive financial results, significant growth, and presented aggressive forward guidance.  However, unbeknownst to the public, the Company was facing declining demand for its products and the Individual Defendants had no reasonable basis to present such aggressive forecasts as they had.  The Individual Defendants knew that the Company was encountering lowered demand and weak sales for its flag-ship units, including its TVs,

- 1 -

entertainment hardware, and software products. Yet, instead of lowering Best Buy's earnings guidance accordingly, the Individual Defendants stubbornly increased the Company's earnings guidance, assuring investors that sales would pick-up in the back-end of the fiscal year.

5.    While disseminating an overly optimistic business outlook for the Company with no reasonable basis to do so, the Director Defendants (as defined herein) caused the Company to execute repurchases of Best Buy's own stock at inflated prices. These repurchases were a deliberate and calculated move by these Director Defendants to manipulate the Company's earnings per share ("EPS") figures and EPS guidance in the midst of weak sales and fast-declining demand for the Company's products.

6.    Ultimately, the Individual Defendants could not maintain the ruse that the Company would achieve its previously forecasted aggressive guidance for much longer. In fact, when the Individual Defendants inevitably lowered Best Buy's earnings guidance, they acknowledged that the adjusted guidance would have been even lower but for the repurchased shares. When the truth about the Company's inability to meet its business outlook was revealed, its market capitalization fell by approximately $6.3 billion or 31.2% and investors filed a securities fraud class action against the Company.

7.    The Insider Selling Defendants (as defined herein) utilized their knowledge of Best Buy's true health and inflated stock price for their own benefit by selling over $11 million worth of their personally-held stock, while in possession of material, adverse non-public information.

8.    Plaintiff now seeks to hold these fiduciaries accountable for their misconduct.

- 2 -

## JURISDICTION AND VENUE

9.     This Court has jurisdiction in this case under Article III of the United States Constitution and 28 U.S.C. §1331 because of claims arising under the Securities Exchange Act of 1934 (the "Exchange Act"). This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

10.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Courts permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) Best Buy maintains its principal place of business in the District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Best Buy occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

12.    Plaintiff Daniel Himmel is a Best Buy shareholder, was a shareholder of Best Buy at the time of the wrongdoing complained, and has continuously been a shareholder of Best Buy.

13.    Nominal defendant Best Buy is a Minnesota corporation and a multinational retailer of consumer electronics, home office products, entertainment products, appliances, and related services.  Best Buy operates retail stores and call centers and conducts online retail operations, all under a variety of brand names, including Best Buy, Best Buy Mobile, The Carphone Warehouse, Five Star, Future Shop, Geek Squad, Magnolia Audio Video, Napster, Pacific Sales, and The Phone House.  At the end of fiscal year 2011, Best Buy employed approximately 180,000 full-time, part-time, and seasonal employees at more than 1,000 stores domestically and more than 2,500 stores internationally.  Best Buy's principal executive offices are located at 7601 Penn Avenue South, Richfield, Minnesota.

14.    Defendant Brian J. Dunn ("Dunn") is Best Buy's Chief Executive Officer ("CEO") and a director and has been since June 2009.  Dunn was also Best Buy's President and Chief Operating Officer ("COO") from February 2006 to June 2009; President – Retail, North America from December 2004 to February 2006; Executive Vice President – Best Buy U.S. Retail from March 2002 to December 2004; and held various other positions at the Company since joining in 1985.  Dunn is named as a defendant in securities class action complaints that allege he violated sections 10(b) and 20(a) of the Exchange Act.  Dunn knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and conference calls concerning its financial health and business

prospects that: (i) failed to disclose the Company could not achieve its reported business outlook and aggressive guidance due to declining consumer demand for its products and weak sales results; (ii) concealed the fact that the Company would have to significantly manipulate its earnings to meet earnings forecasts including substantially cutting its Selling, General & Administrative ("SG&A") expenses and executing massive repurchases of its own stock to increase EPS; and (iii) failed to disclose that the Company had no reasonable basis to make positive statements about its future growth and provide aggressive guidance in light of the fact that it knew declining demand and weak sales would adversely affect its revenue and earnings.  While Best Buy's stock traded at artificially inflated prices due to the foregoing improper statements, Dunn authorized and implemented repurchases of the Company's stock at these artificially inflated prices.  Further, Dunn sold 13,848 shares of his stock for $591,765.20 in proceeds while in possession of material, non-public information concerning Best Buy's true business health.   Best Buy paid Dunn the following compensation as an executive:

| Fiscal Year | Salary | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation |
|---|---|---|---|---|
| 2011 | $1,061,540 | $3,206,125 | $746,667 | $15,168 |

15.    Defendant James L. Muehlbauer ("Muehlbauer") is Best Buy's Chief Financial Officer ("CFO") and Executive Vice President – Finance and has been since April 2008. Muehlbauer was also Best Buy's Interim Enterprise CFO from September 2007 to April 2008; Senior Vice President and CFO – Best Buy U.S. from December 2006 to September 2007; Senior Vice President – Finance from June 2003 to December 2006; and Vice President and CFO of Musicland from 2002 to June 2003.  Muehlbauer is named as a

defendant in securities class action complaints that allege he violated sections 10(b) and 20(a) of the Exchange Act. Muehlbauer knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and conference calls concerning its financial health and business prospects that: (i) failed to disclose the Company could not achieve its reported business outlook and aggressive guidance due to declining consumer demand for its products and weak sales results; (ii) concealed the fact that the Company would have to significantly manipulate its earnings to meet earnings forecasts including substantially cutting its SG&A and executing massive repurchases of its own stock to increase EPS; and (iii) failed to disclose that the Company had no reasonable basis to make positive statements about its future growth and provide aggressive guidance in light of the fact that it knew declining demand and weak sales would adversely affect its revenue and earnings. Best Buy paid Muehlbauer the following compensation as an executive:

| Fiscal Year | Salary | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation |
|---|---|---|---|---|
| 2011 | $662,308 | $1,172,700 | $290,500 | $16,801 |

16. Defendant Richard M. Schulze ("Schulze") is Best Buy's Chairman of the Board of Directors (the "Board") and has been since at least May 1994 and a director and has been since he founded the Company in 1966. Schulze was also Best Buy's CEO from at least May 1994 to June 2002 and principal executive officer from the Company's inception in 1966 to June 2002. Schulze knowingly or recklessly allowed the Company to make improper statements in its press releases concerning its financial health and business prospects that: (i) failed to disclose the Company could not achieve its reported business outlook and aggressive guidance due to declining consumer demand for its products and

weak sales results; (ii) concealed the fact that the Company would have to significantly manipulate its earnings to meet earnings forecasts including substantially cutting its SG&A and executing massive repurchases of its own stock to increase EPS; and (iii) failed to disclose that the Company had no reasonable basis to make positive statements about its future growth and provide aggressive guidance in light of the fact that it knew declining demand and weak sales would adversely affect its revenue and earnings.  While Best Buy's stock traded at artificially inflated prices due to the foregoing improper statements, Schulze authorized repurchases of the Company's stock at these artificially inflated prices.  Best Buy paid Schulze the following compensation as a director:

| Fiscal Year | Total |
|---|---|
| 2011 | $161,406 |

17.    Defendant Matthew H. Paull ("Paull") is Best Buy's Lead Independent Director and has been since June 2010 and a director and has been since September 2003. Paull is also a member of Best Buy's Audit Committee and has been since at least April 2009.  Paull knowingly or recklessly allowed the Company to make improper statements in its press releases concerning its financial health and business prospects that: (i) failed to disclose the Company could not achieve its reported business outlook and aggressive guidance due to declining consumer demand for its products and weak sales results; (ii) concealed the fact that the Company would have to significantly manipulate its earnings to meet earnings forecasts including substantially cutting its SG&A and executing massive repurchases of its own stock to increase EPS; and (iii) failed to disclose that the Company had no reasonable basis to make positive statements about its future growth and provide

aggressive guidance in light of the fact that it knew declining demand and weak sales would adversely affect its revenue and earnings. While Best Buy's stock traded at artificially inflated prices due to the foregoing improper statements, Paull authorized repurchases of the Company's stock at these artificially inflated prices. Best Buy paid Paull the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2011 | $82,500 | $147,200 | $229,700 |

18. Defendant Hatim A. Tyabji ("Tyabji") is a Best Buy director and has been since April 1998. Tyabji is also the Chairman of Best Buy's Audit Committee and has been since at least April 2009. Tyabji knowingly or recklessly allowed the Company to make improper statements in its press releases concerning its financial health and business prospects that: (i) failed to disclose the Company could not achieve its reported business outlook and aggressive guidance due to declining consumer demand for its products and weak sales results; (ii) concealed the fact that the Company would have to significantly manipulate its earnings to meet earnings forecasts including substantially cutting its SG&A and executing massive repurchases of its own stock to increase EPS; and (iii) failed to disclose that the Company had no reasonable basis to make positive statements about its future growth and provide aggressive guidance in light of the fact that it knew declining demand and weak sales would adversely affect its revenue and earnings. While Best Buy's stock traded at artificially inflated prices due to the foregoing improper statements, Tyabji authorized repurchases of the Company's stock at these artificially inflated prices. Best Buy paid Tyabji the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2011 | $90,000 | $147,200 | $237,200 |

19.     Defendant Kathy J. Higgins Victor ("Higgins Victor") is a Best Buy director and has been since November 1999.  Higgins Victor knowingly or recklessly allowed the Company to make improper statements in its press releases concerning its financial health and business prospects that: (i) failed to disclose the Company could not achieve its reported business outlook and aggressive guidance due to declining consumer demand for its products and weak sales results; (ii) concealed the fact that the Company would have to significantly manipulate its earnings to meet earnings forecasts including substantially cutting its SG&A and executing massive repurchases of its own stock to increase EPS; and (iii) failed to disclose that the Company had no reasonable basis to make positive statements about its future growth and provide aggressive guidance in light of the fact that it knew declining demand and weak sales would adversely affect its revenue and earnings.  While Best Buy's stock traded at artificially inflated prices due to the foregoing improper statements, Higgins Victor authorized repurchases of the Company's stock at these artificially inflated prices.  Best Buy paid Higgins Victor the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2011 | $85,000 | $147,200 | $232,200 |

20.     Defendant Ronald James ("James") is a Best Buy director and has been since May 2004.  James knowingly or recklessly allowed the Company to make improper statements in its press releases concerning its financial health and business prospects that:

(i) failed to disclose the Company could not achieve its reported business outlook and aggressive guidance due to declining consumer demand for its products and weak sales results; (ii) concealed the fact that the Company would have to significantly manipulate its earnings to meet earnings forecasts including substantially cutting its SG&A and executing massive repurchases of its own stock to increase EPS; and (iii) failed to disclose that the Company had no reasonable basis to make positive statements about its future growth and provide aggressive guidance in light of the fact that it knew declining demand and weak sales would adversely affect its revenue and earnings. While Best Buy's stock traded at artificially inflated prices due to the foregoing improper statements, James authorized repurchases of the Company's stock at these artificially inflated prices. Best Buy paid James the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2011 | $86,250 | $147,200 | $233,450 |

21.    Defendant Rogelio M. Rebolledo ("Rebolledo") is a Best Buy director and has been since August 2006. Rebolledo knowingly or recklessly allowed the Company to make improper statements in its press releases concerning its financial health and business prospects that: (i) failed to disclose the Company could not achieve its reported business outlook and aggressive guidance due to declining consumer demand for its products and weak sales results; (ii) concealed the fact that the Company would have to significantly manipulate its earnings to meet earnings forecasts including substantially cutting its SG&A and executing massive repurchases of its own stock to increase EPS; and (iii) failed to disclose that the Company had no reasonable basis to make positive statements about its

future growth and provide aggressive guidance in light of the fact that it knew declining demand and weak sales would adversely affect its revenue and earnings. While Best Buy's stock traded at artificially inflated prices due to the foregoing improper statements, Rebolledo authorized repurchases of the Company's stock at these artificially inflated prices. Best Buy paid Rebolledo the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2011 | $75,000 | $147,200 | $222,200 |

22.    Defendant George L. Mikan III ("Mikan") is a Best Buy director and has been since April 2008. Mikan is also a member of Best Buy's Audit Committee and has been since at least April 2009. Mikan knowingly or recklessly allowed the Company to make improper statements in its press releases concerning its financial health and business prospects that: (i) failed to disclose the Company could not achieve its reported business outlook and aggressive guidance due to declining consumer demand for its products and weak sales results; (ii) concealed the fact that the Company would have to significantly manipulate its earnings to meet earnings forecasts including substantially cutting its SG&A and executing massive repurchases of its own stock to increase EPS; and (iii) failed to disclose that the Company had no reasonable basis to make positive statements about its future growth and provide aggressive guidance in light of the fact it they knew declining demand and weak sales would adversely affect its revenue and earnings. While Best Buy's stock traded at artificially inflated prices due to the foregoing improper statements, Mikan authorized repurchases of the Company's stock at these artificially inflated prices.    Best Buy paid Mikan the following compensation as a director:

- 11 -

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2011 | $75,000 | $147,200 | $222,200 |

23.    Defendant Gérard R. Vittecoq ("Vittecoq") is a Best Buy director and has been since September 2008.  Vittecoq is also a member of Best Buy's Audit Committee and has been since at least April 2009.  Vittecoq knowingly or recklessly allowed the Company to make improper statements in its press releases concerning its financial health and business prospects that: (i) failed to disclose the Company could not achieve its reported business outlook and aggressive guidance due to declining consumer demand for its products and weak sales results; (ii) concealed the fact that the Company would have to significantly manipulate its earnings to meet earnings forecasts including substantially cutting its SG&A and executing massive repurchases of its own stock to increase EPS; and (iii) failed to disclose that the Company had no reasonable basis to make positive statements about its future growth and provide aggressive guidance in light of the fact it they knew declining demand and weak sales would adversely affect its revenue and earnings.  While Best Buy's stock traded at artificially inflated prices due to the foregoing improper statements, Vittecoq authorized repurchases of the Company's stock at these artificially inflated prices.  Best Buy paid Vittecoq the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2011 | $75,000 | $147,200 | $222,200 |

24.    Defendant Sanjay Khosla ("Khosla") is a Best Buy director and has been since October 2008.  Khosla knowingly or recklessly allowed the Company to make improper statements in its press releases concerning its financial health and business prospects that:

- 12 -

(i) failed to disclose the Company could not achieve its reported business outlook and aggressive guidance due to declining consumer demand for its products and weak sales results; (ii) concealed the fact that the Company would have to significantly manipulate its earnings to meet earnings forecasts including substantially cutting its SG&A and executing massive repurchases of its own stock to increase EPS; and (iii) failed to disclose that the Company had no reasonable basis to make positive statements about its future growth and provide aggressive guidance in light of the fact it they knew declining demand and weak sales would adversely affect its revenue and earnings.  While Best Buy's stock traded at artificially inflated prices due to the foregoing improper statements, Khosla authorized repurchases of the Company's stock at these artificially inflated prices.   Best Buy paid Khosla the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2011 | $82,500 | $147,200 | $229,700 |

25.    Defendant Lisa M. Caputo ("Caputo") is a Best Buy director and has been since December 2009.  Caputo knowingly or recklessly allowed the Company to make improper statements in its press releases concerning its financial health and business prospects that: (i) failed to disclose the Company could not achieve its reported business outlook and aggressive guidance due to declining consumer demand for its products and weak sales results; (ii) concealed the fact that the Company would have to significantly manipulate its earnings to meet earnings forecasts including substantially cutting its SG&A and executing massive repurchases of its own stock to increase EPS; and (iii) failed to disclose that the Company had no reasonable basis to make positive statements about its

future growth and provide aggressive guidance in light of the fact that it knew declining demand and weak sales would adversely affect its revenue and earnings. While Best Buy's stock traded at artificially inflated prices due to the foregoing improper statements, Caputo authorized repurchases of the Company's stock at these artificially inflated prices. Best Buy paid Caputo the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2011 | $75,000 | $147,200 | $222,200 |

26.   Defendant Bradbury H. Anderson ("Anderson") was Best Buy's Vice Chairman of the Board from at least May 2001 to June 2010 and a director from August 1986 to June 2010. Anderson was also Best Buy's CEO from June 2002 to June 2009; President and COO from April 1991 to June 2002; Executive Vice President – Marketing from February 1986 to April 1991; and Vice President from 1981 to 1986. Anderson knowingly or recklessly allowed the Company to make improper statements in its press releases concerning its financial health and business prospects that: (i) failed to disclose the Company could not achieve its reported business outlook and aggressive guidance due to declining consumer demand for its products and weak sales results; (ii) concealed the fact that the Company would have to significantly manipulate its earnings to meet earnings forecasts including substantially cutting its SG&A and executing massive repurchases of its own stock to increase EPS; and (iii) failed to disclose that the Company had no reasonable basis to make positive statements about its future growth and provide aggressive guidance in light of the fact that it knew declining demand and weak sales would adversely affect its revenue and earnings. While Best Buy's stock traded at artificially inflated prices due to the

foregoing improper statements, Anderson authorized repurchases of the Company's stock at these artificially inflated prices. Best Buy paid Anderson the following compensation as a director:

| Fiscal Year | Option Awards | All Other Compensation | Total |
|---|---|---|---|
| 2011 | $147,200 | $79,446 | $226,646 |

27.    Defendant Allen U. Lenzmeier ("Lenzmeier") was a Best Buy director from February 2001 to June 2010. Lenzmeier was also Best Buy's Vice Chairman from December 2004 to February 2009; President and COO from March 2002 to December 2004; President – Best Buy Retail Stores from February 2001 to 2002; Executive Vice President and CFO from 1991 to February 2001; Senior Vice President from 1986 to 1991; and Vice President – Finance and Operations from 1984 to 1986. Lenzmeier knowingly or recklessly allowed the Company to make improper statements in its press releases concerning its financial health and business prospects that: (i) failed to disclose the Company could not achieve its reported business outlook and aggressive guidance due to declining consumer demand for its products and weak sales results; (ii) concealed the fact that the Company would have to significantly manipulate its earnings to meet earnings forecasts including substantially cutting its SG&A and executing massive repurchases of its own stock to increase EPS; and (iii) failed to disclose that the Company had no reasonable basis to make positive statements about its future growth and provide aggressive guidance in light of the fact that it knew declining demand and weak sales would adversely affect its revenue and earnings. While Best Buy's stock traded at artificially inflated prices due to the foregoing improper statements, Lenzmeier authorized repurchases of the Company's stock at these

artificially inflated prices. Further, Lenzmeier sold 180,000 shares of his stock for $8,649,108 in proceeds while in possession of material, non-public information concerning Best Buy's true business health. Best Buy paid Lenzmeier the following compensation as a director:

| Fiscal Year | Total |
|---|---|
| 2011 | $165,950 |

28.    Defendant Elliot S. Kaplan ("Kaplan") was Best Buy's Secretary and a director from January 1971 to June 2011. Kaplan knowingly or recklessly allowed the Company to make improper statements in its press releases concerning its financial health and business prospects that: (i) failed to disclose the Company could not achieve its reported business outlook and aggressive guidance due to declining consumer demand for its products and weak sales results; (ii) concealed the fact that the Company would have to significantly manipulate its earnings to meet earnings forecasts including substantially cutting its SG&A and executing massive repurchases of its own stock to increase EPS; and (iii) failed to disclose that the Company had no reasonable basis to make positive statements about its future growth and provide aggressive guidance in light of the fact that it knew declining demand and weak sales would adversely affect its revenue and earnings. While Best Buy's stock traded at artificially inflated prices due to the foregoing improper statements, Kaplan authorized repurchases of the Company's stock at these artificially inflated prices. Further, Kaplan sold 22,500 shares of his stock for $1,027,489.50 in proceeds while in possession of material, non-public information concerning Best Buy's true business health. Best Buy paid Kaplan the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2011 | $85,000 | $147,200 | $232,200 |

29.    Defendant Frank D. Trestman ("Trestman") was a Best Buy director from December 1984 to June 2010.  Trestman knowingly or recklessly allowed the Company to make improper statements in its press releases concerning its financial health and business prospects that: (i) failed to disclose the Company could not achieve its reported business outlook and aggressive guidance due to declining consumer demand for its products and weak sales results; (ii) concealed the fact that the Company would have to significantly manipulate its earnings to meet earnings forecasts including substantially cutting its SG&A and executing massive repurchases of its own stock to increase EPS; and (iii) failed to disclose that the Company had no reasonable basis to make positive statements about its future growth and provide aggressive guidance in light of the fact that it knew declining demand and weak sales would adversely affect its revenue and earnings.  While Best Buy's stock traded at artificially inflated prices due to the foregoing improper statements, Trestman authorized repurchases of the Company's stock at these artificially inflated prices. Further, Trestman sold 16,835 shares of his stock for $774,468.92 in proceeds while in possession of material, non-public information concerning Best Buy's true business health. Best Buy paid Trestman the following compensation as a director:

| Fiscal Year | Total |
|---|---|
| 2011 | $188,629 |

30.    The defendants identified in ¶¶14, 16-29 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶17-18, 22-23 are referred to herein as the

"Audit Committee Defendants."  The defendants identified in ¶¶14, 27-29 are referred to herein as the "Insider Selling Defendants."  Collectively, the defendants identified in ¶¶14-29 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

31.    By reason of their positions as officers, directors, and/or fiduciaries of Best Buy and because of their ability to control the business and corporate affairs of Best Buy, Individual Defendants owed and owe Best Buy and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Best Buy in a fair, just, honest, and equitable manner.  Individual Defendants were and are required to act in furtherance of the best interests of Best Buy and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

32.    Each officer and director of the Company owes to Best Buy and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

**Code of Business Conduct**

33.     The Company had in place its Code of Business Ethics (the "Code") which sets forth the Company's policies, procedures and guidelines for ethical decision-making for every Best Buy employee to "reinforce and uphold [its] values." According to the Code, all employees must "[a]ppropriately manage and safeguard Company's assets." Further, employees must "[f]ully and fairly disclose material financial information." The Code expressly proscribes insider trading. The Code forbids all employees from trading "Best Buy securities … if they possess material non-public information."

**Audit Committee Duties**

34.     In addition to these duties, under the Best Buy Board's Audit Committee Charter, defendants Mikan, Paull, Tyabji, and Vittecoq, otherwise referred to as the Audit Committee Defendants, owe and/or owed specific duties to Best Buy. According to the Audit Committee Charter, the Audit Committee Defendants were responsible for overseeing, among other things, "the integrity of the Company's financial statements and financial reporting processes," the Company's internal accounting systems, financial and operational controls," and the Company's compliance with the Code and "legal and regulatory requirements." In particular, the Audit Committee Defendants had a duty and responsibility to review the Company's interim financial statements, earnings press releases, and its earnings guidance. Further, the Audit Committee was required to review "the financial statements and disclosures under Management's Discussion and Analysis of Financial Condition and Results of Operations, to be included in the Company's Annual Reports on Form 10-K, … [and] the reasonableness of significant judgments and the clarity

of the disclosures in the financial statements." The Audit Committee met ten times during the 2011 fiscal year.

**Control, Access, and Authority**

35.    Individual Defendants, because of their positions of control and authority as officers and/or directors of Best Buy, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

36.    Because of their advisory, executive, managerial, and directorial positions with Best Buy, each Individual Defendant had access to adverse, non-public information about the financial condition, operations, and growth prospects of Best Buy.

37.    At all times relevant hereto, each Individual Defendant was the agent of each of the other Individual Defendants and of Best Buy, and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

38.    To discharge their duties, the officers and directors of Best Buy were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Best Buy were required to, among other things:

(a)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial health and business prospects;

(b)      ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations;

(c)      ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(d)      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(e)      remain informed as to how Best Buy conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

**Breach of Duties**

39.     Each Individual Defendant, by virtue of his or her position as an officer and/or director, owed to the Company the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Best Buy, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the

Company has been ratified by the remaining Individual Defendants who collectively comprised all of Best Buy's Board.

40.     The Individual Defendants breached their duty of loyalty and good faith by allowing the other Individual Defendants to cause, or by themselves causing, the Company to issue improper statements regarding its financial health and business prospects.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of class action lawsuits that allege violations of the federal securities laws.  As a result, Best Buy has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

41.     In committing the wrongful acts alleged herein, Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

42.     During all times relevant hereto, Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) cause the Company to issue improper statements in its press releases and conference calls regarding its financial health and business prospects; (ii) conceal the improper statements regarding the Company's financial condition and business prospects that were unsustainable due to the

decline in the demand of its products; (iii) facilitate the Insider Selling Defendants' sale of over $11 million of their personally-held shares; (iv) cause the Company to buy back over $1.1 billion of its own securities at artificially inflated prices; (v) enhance the Individual Defendants' executive and directorial positions at Best Buy and the profits, power, and prestige that Individual Defendants enjoyed as a result of holding these positions; and (v) deceive the investing public regarding the mismanagement of Best Buy. In furtherance of this plan, conspiracy, and course of conduct, Individual Defendants, collectively and individually, took the actions set forth herein.

43.    Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During this time, Individual Defendants permitted the Company to issue improper statements regarding the Company's financial results and business outlook.

44.    The purpose and effect of Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise Individual Defendants' violations of law, breach of fiduciary duties, waste of corporate assets, and unjust enrichment, and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

45.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements and fail to act in the face of a known duty to do so. Because the actions described herein occurred under the authority of the Board, each

Individual Defendant was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

46.    Each Individual Defendant aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of or recklessly disregarded his or her overall contribution to and furtherance of the wrongdoing.

## IMPROPER STATEMENTS

47.    The improper statements began on March 25, 2010, when Best Buy issued a press release announcing its financial results for both the fourth quarter and the 2010 fiscal year ended February 27, 2010.  In the press release, defendant Dunn expressed his pleasure over "another outstanding year," reporting earnings of $779 million and EPS of $1.82 for the quarter.  Further, the Company provided an optimistic business outlook for fiscal year 2011, including an EPS guidance of $3.45 to $3.60, representing a 10% to 14% increase over the fiscal 2010 adjusted diluted EPS.  Best Buy also disclosed that it would execute share repurchases in fiscal 2011, but that its EPS forecast did not account for the anticipated repurchases. The press release read as follows, in pertinent parts:

> Best Buy Co., Inc. (NYSE:BBY), a leading retailer of consumer electronics, today reported net earnings of $779 million, or $1.82 per diluted share, for its fiscal fourth quarter ended on Feb. 27, 2010, compared with $570 million, or $1.35 per diluted share, for the prior-year period.  Diluted earnings per share increased 13 percent versus the prior-year period's adjusted diluted earnings per share of $1.61, which excluded the impact of restructuring and impairment charges incurred in the previous year's fiscal fourth quarter. A reconciliation of adjusted diluted earnings per share and other non-GAAP financial measures

for the fiscal fourth quarter and full-year are presented in the appendix attached to this earnings release.

"In a year of ever-changing variables, the one constant, as always, was the value our people provide. They are the differentiating factor for Best Buy, and I want to thank them for another outstanding year," said Brian Dunn, CEO of Best Buy. "We believe the next stage of our growth will be fueled by our employees helping customers connect to the things and people they care most about, and our investments around the world flow directly from that point of view."

\* \* \*

**Best Buy Establishes Fiscal 2011 EPS Outlook of $3.45 to $3.60**

"In fiscal 2010, we made a deliberate effort to profitably acquire new customers with the purpose of introducing them to the benefits of our connected world strategy. In fiscal 2011, we plan to capitalize on these actions to create stronger relationships with our customers and improve profits," said Muehlbauer.

The company's guidance range for the fiscal year ending on Feb. 26, 2011, includes the following assumptions:

- ***Revenue of $52.0 billion to $53.0 billion, an increase of 5 percent to 7 percent.***

- ***A comparable store sales increase of 1 percent to 3 percent.***

- Square footage growth of 3 percent to 5 percent, which includes the opening of 50-to-55 net new Best Buy branded large-format stores primarily in the domestic segment. The company plans to open 75-to-100 small-format stores, primarily Best Buy Mobile stand-alone-stores in the United States. In addition, the company plans to open 10-to-15 Five Star stores in China.

- ***Operating income rate improvement of 30-to-40 basis points driven by both gross profit rate expansion and SG&A leverage.*** Domestic segment operating income rate to improve at the high-end of the above range.

- An effective income tax rate of 38.0 percent to 38.5 percent.

- Capital expenditures of approximately $850 million.

- ***Earnings per diluted share of $3.45 to $3.60, which represents an increase of 10 percent to 14 percent versus fiscal 2010's adjusted diluted EPS.***

The company noted that it has $2.5 billion remaining under its existing board-approved share repurchase authorization ***and intends to resume share repurchases***. However, ***the impact of potential share repurchases has not been included in the company's fiscal 2011 diluted EPS guidance.***

48.     That same day, in an earnings conference call, defendants Dunn and Muehlbauer reiterated the Company's financial results and business outlook presented in the press release.   Further, defendant Muehlbauer discussed the Company's anticipated repurchase of its stock and its implication on the Company's fiscal year 2011 forecast:

**James L. Muehlbauer, Executive Vice President, Finance and Chief Financial Officer**

So turning now to fiscal 2011, let me share with you our thoughts on the upcoming year. ***Our plans call for top line revenue of 52 to 53 billion, which represents a 5 to 7% growth year over year. The revenue outlook includes comparable store sales growth between 1 to 3%.*** Additionally, we intend to continue moderating our square footage growth and leverage our existing footprint.

\* \* \*

So while I anticipate that we will return to the market to buy back shares***, our earnings and EPS guidance for fiscal 2011 does not reflect the impact of share re-purchases.***

\* \* \*

***Bringing it all together, we are forecasting annual EPS of $3.45 to $3.60 for fiscal 2011, representing an improvement range of 10 to 14% year over year versus our fiscal 2010 adjusted earnings***.

49.     On June 15, 2010, Best Buy issued a press release announcing its financial results for the fiscal 2011 first quarter ended May 29, 2010.   The Company reported earnings of $155 million and EPS of $0.36 for the quarter.   The Company's earnings

drastically underperformed consensus Wall Street estimates for EPS of $0.50 per share. Further, the Company reported comparable-store sales increase of merely 1.9% which consequently increased the Company's inventory by 10% year-over-year, and significant SG&A expenses of $2.5 billion (an increase of 12% year-over-year). According to the press release, the flat-lining sales were attributed to declining sales of TVs, and in gaming, music, and movies. Nevertheless, defendant Dunn stressed that there were "many positive indicators in the first quarter, highlighted by the excellent performance of Best Buy Mobile," that gave him "*confidence in [Best Buy's] ability to achieve [its] financial goals this year*." Defendant Muehlbauer added, "[w]hile our financial results in the fiscal quarter were below expectations, we remain confident that the strategic investments we are making will deliver more robust connected solutions for customers and support increased margin expansion during the fiscal year." Notwithstanding the underwhelming financial results reported for the quarter, the Company surprisingly maintained its previously reported fiscal year 2011 sales, revenue, and earnings forecasts. The press release read as follows, in pertinent parts:

> Best Buy Co., Inc. (NYSE:BBY), a leading retailer of consumer electronics, today reported net earnings of $155 million, or $0.36 per diluted share, for its fiscal first quarter ended May 29, 2010, compared with $153 million, or $0.36 per diluted share, for the prior-year period. Diluted earnings per share decreased 14 percent versus the prior-year period's adjusted diluted earnings per share of $0.42, which excluded the impact of restructuring charges incurred in the prior year's fiscal first quarter. A reconciliation of adjusted diluted earnings per share and other non-GAAP financial measures for the first quarter of fiscal 2010 are presented in the appendix attached to this news release.
>
> *"There were many positive indicators in the first quarter, highlighted by the excellent performance of Best Buy Mobile," said Brian Dunn, CEO of Best Buy.* "These indicators, coupled with the business model changes we are

making to create better solutions for the millions of connectable devices we sell, *give me confidence in our ability to achieve our financial goals this year."*

\* \* \*

*The company's selling, general and administrative expense (SG&A) rate for the fiscal first quarter was 23.0 percent of revenue, an increase of 110 basis points when compared to the prior-year period.*

\* \* \*

### Company Affirms Fiscal 2011 Annual Guidance

*"While our financial results in the fiscal first quarter were below expectations, we remain confident that the strategic investments we are making will deliver more robust connected solutions for customers and support increased margin expansion during the fiscal year," said Jim Muehlbauer, Best Buy's executive vice president of finance and CFO.* "We continue to expect solid top-line growth and expansion of our annual operating margin to approximately 5 percent of revenue in fiscal 2011."

*The company also reiterated its fiscal 2011 outlook and annual diluted EPS guidance as provided on March 25, 2010.*

50.    In the press release, the Company also disclosed that it had resumed repurchases of its common stock:

*During the first quarter of fiscal 2011, the company resumed repurchases of its common stock and acquired approximately 2.5 million common shares.* On May 6, 2010, the company paid a dividend of 14 cents per common share, or $59 million in the aggregate.

51.    That same day, in an earnings conference call, defendants Dunn and Muehlbauer reiterated the Company's financial results and business outlook presented in the press release.  Defendant Dunn acknowledged the Company's underperforming results and blamed it on slower "customer traffic," and a higher than expected increase in SG&A expenses:

- 28 -

**Brian J. Dunn, Chief Executive Officer**

First things first. While there were some positive signs in our results, ***this quarter's earnings were below our expectations*** and that's something I, and everyone on this management team, take very seriously.

***There are two primary drivers behind these results. First, we experienced some variability in customer traffic in the U.S. over of the course of the last three months which resulted in a slightly lower comp than we were expecting. Second***, we planned for higher SG&A during Q1 to accelerate some of the capabilities to sell more robust solutions for customers. However, ***our SG&A spend still came in higher than we had targeted for the quarter***.

\* \* \*

I'll wrap up my comments now by reiterating that while I'm neither pleased nor satisfied with our first quarter financial results, ***it does not change my confidence that we can and will deliver our annual guidance and drive value for the long term.***

\* \* \*

**James L. Muehlbauer, Executive Vice President, Finance and Chief Financial Officer**

And finally, we continue to expect to deliver our financial goals for the year. ***We are maintaining our annual guidance expectations of strong EPS growth of 10 to 14% driven by top line growth and expansion of our operating margins***.

52.    When questioned by analysts as to the Company's insistence on reaffirming its business outlook notwithstanding the weak financial results reported for the quarter, defendant Muehlbauer steadfastly maintained the Company expects to meet its business forecast:

<Q - Analyst>:

One more question on the guidance, if you don't mind. I certainly understand you made it quite clear your SG&A spending for the year is unchanged. However, ***in the first quarter, to be fair, your revenues did fall short of expectations. When you look at the guidance for the full year, is your confidence still in the 3.45 to 3.60 range predicated on recapturing those***

- 29 -

*revenues, or do you think that SG&A spending may actually be lower than what was first anticipated*?

\*   \*   \*

<A - James L. Muehlbauer, Executive Vice President, Finance and Chief Financial Officer>:

A couple of pieces there, Alan. ***So we've maintained all aspects of our guidance, so we still see the comp of 1 to 3 for the year.*** As I mentioned in my comments, Q1 has just not been a historically strong indicator of what consumer behavior is going to be for the year. So it's just too early to call out. So we did fall a little short of our plan in maintaining our guidance of 1to 3. Clearly there is room in that guidance range, ***but clearly we expect to recoup that as we move through the year given the product cycles we see coming, and we'll just have to see what happens during our key selling season around the holiday time, so no changes on that front.***

Correspondingly, same with the EPS guidance. ***Based on what we see today in Q1, 3.45 to 3.60 is still the best range we have for the year***.

\*   \*   \*

<Q - Analyst>:

Okay. I guess I still don't understand all things being equal how given your performance in Q1 you could be more optimistic about the remainder of the year than where you were in March.

<A - James L. Muehlbauer, Executive Vice President, Finance and Chief Financial Officer>:

Yeah. Where are you getting more optimistic, Alan?

<Q - Analyst>:

Well...

<A - James L. Muehlbauer, Executive Vice President, Finance and Chief Financial Officer>:

I think what we're saying -

<Q - Analyst>:

*Admittedly you fell short of your expectations in Q1. You're still backing guidance, which means that you have to exceed your original expectations in the remaining quarters. Is that not a fair assumption?*

<A - James L. Muehlbauer, Executive Vice President, Finance and Chief Financial Officer>:

*That is fair. But if you look at the weight of the business that's in Q1 versus previous quarters, Q1 is our smallest quarter. It's 10% of our year.*

53.    On September 14, 2010, Best Buy issued a press release announcing its financial results for the fiscal 2011 second quarter ended August 28, 2010.  The Company reported earnings of $254 million (an increase of 61% year-over-year) and EPS of $0.60 (an increase of 62% year-over-year) for the quarter.  However, Best Buy continued to report disappointing sales figures attributed to decline in TV, entertainment hardware, and software sales, as the Company disclosed a domestic comparable-store sales decline of 1.4%.  Accordingly, the Company reduced its fiscal year 2011 revenue guidance by a $1 billion, and dropped its comparable store sales growth forecast from 1%-3% to 1%-2%.  However, despite its poor sales, the Company *increased its EPS guidance to $3.55 to $3.70 per share*, and its operating income rate projection to 40-55 basis points.  Defendant Dunn touted the Company's "strong results," and claimed that the "quarter's results [gave him] confidence that [Best Buy] [was] making progress in driving value through growth in connections for [its] customers, vendors and shareholders."  In the press release, the Company also disclosed that it had repurchased approximately $600 million, or seventeen million shares of its common stock at an average price of $34 per share.  Defendant Muehlbauer attributed the raised earnings guidance to "strong operating margin performance in the first half and *share repurchases made year-to-date through the fiscal*

- 31 -

*second quarter*."  Best Buy's inclusion of the impact of the share repurchases on its earnings

guidance departed from its previous calculation of earning guidance, which did not account

for the Company's share repurchase in projecting its earnings.  The press release read as

follows, in pertinent parts:

> Best Buy Co., Inc. (NYSE:BBY), the world's leading retailer of consumer electronics, today reported net earnings of $254 million, or $0.60 per diluted share, for its fiscal second quarter ended August 28, 2010, compared with $158 million, or $0.37 per diluted share, for the prior-year period, up 61% and 62%, respectively.
>
> ***"We're still in the early stages of our Connected World strategy, but this quarter's results give me continued confidence that we're making progress in driving value through growth in connections for our customers, vendors and shareholders," said Brian Dunn, CEO of Best Buy.*** "I want to thank our employees for delivering these strong results - especially a significant expansion in operating margin and earnings growth in a quarter with constrained consumer spending."
>
> <div align="center">*   *   *</div>
>
> **Stock Repurchase and Dividend**
>
> ***During the second quarter of fiscal 2011, the company repurchased approximately $600 million, or 17 million shares of its common stock at an average price of $34 per share. For the first half of fiscal 2011, the company repurchased approximately $700 million, or 20 million shares of its common stock at an average price of $36 per share.*** The company also noted that it has $1.8 billion remaining capacity under its $5.5 billion share repurchase authorization. On July 27, 2010, the company paid a dividend of 14 cents per common share, or $58 million in the aggregate.
>
> **Fiscal 2011 Annual Guidance Increased**
>
> "We have focused our efforts on improving operating margins and driving profitable growth in the business and are pleased with the progress we have made fiscal year-to-date in a challenging consumer spending environment," said Jim Muehlbauer, Best Buy's executive vice president and CFO. ***"Based on the strong operating margin performance in the first half and share repurchases made year-to-date through the fiscal second quarter, we are raising our earnings per share guidance by 10 cents to $3.55 to $3.70."***

Based on the performance to date and the company's outlook for the year, guidance for the fiscal year ending on Feb. 26, 2011, includes the following assumptions:

- Revenue of approximately $52 billion, a year-over-year increase of 5 percent.

- Full-year comparable store sales increase of 1 percent to 2 percent.

- SG&A dollar year-over-year spend increase of approximately 6 percent.

- Operating income rate improvement of 40-to-55 basis points. Domestic segment operating income rate to improve at the high-end of this range.

- ***Earnings per diluted share of $3.55 to $3.70 which includes an estimated $0.10 cent favorable impact due to the share repurchases completed fiscal year-to-date and represents a 13 percent to 17 percent increase versus fiscal 2010's adjusted diluted EPS. The company noted that the earnings per share guidance continues to exclude the impact of potential share repurchases that may be completed in the second half of fiscal 2011.***

54.    That same day, in an earnings conference call, defendants Dunn and Muehlbauer reiterated the Company's financial results and business outlook presented in the press release.   Further, defendants Dunn and Muehlbauer defended the Company's aggressive earnings guidance in light of the admitted decline in demand and sales of its products:

**James L. Muehlbauer, Executive Vice President – Finance and Chief Financial Officer**

* * *

So looking at the results for the first half of fiscal 2011, while there are many moving pieces that we manage like always, ***we are pleased that our earnings are essentially in line with our original expectations for the year*** as strong gross profit rates and cost control plans worked to offset softer top line growth, particularly in the domestic business.

* * *

Additionally, as Brian mentioned, we expected to see consumer traffic that is episodic in nature, and ***we believe that Best Buy is well positioned to capture – to capitalize on the largest episode of the year, the upcoming holiday period.*** As a result and consistent with our past practice, we are adjusting some the component parts of our full-year guidance this morning in order to provide you our current thinking on how the balance of the year may play out.

\* \* \*

***Bringing these assumptions together, we now expect to deliver 40 to 55 basis points of operating income improvement versus last year.*** Embedded in this estimate is the projection that the domestic business will come in at the top end of that range.

In total, these assumptions, along with the favorable impact of share repurchase activity completed in the first half now ***lead us to an earnings per share guidance range for the year of $3.55 to $3.70, an increase of 13 to 18% versus last year and $0.10 higher than our original range.*** As you can see, ***we are essentially maintaining the operating expectations from our original guidance range and just updating the impact of share repurchases made fiscal year to date. Overall, we are pleased that we are on track to deliver and exceed our annual EPS guidance.***

\* \* \*

<Q - Analyst>:

\* \* \*

Obviously, the gross margin gains are very admirable, and we applaud the move to buy back a significant amount of stock in the second quarter. But nevertheless, the revenue guidance is lower than what you originally articulated. And now you're looking for comps in the second half to be 1 to 3%, in the wake of significantly more difficult compares.

Jim, can you maybe just elaborate a little bit more on ***why you think the revenue line specifically is going to accelerate to a pretty significant extent in the back half of the year***, and in particular, the holiday season?

<A - James L. Muehlbauer, Executive Vice President – Finance and Chief Financial Officer>:

\* \* \*

We know during the holiday season that customers over-index their wallet share into CE products. We have no reason to believe that this holiday season is going to be any different. As a matter of fact, what we have seen during several key drive times, and especially when we have new, hot products, we have customer demand for those hot products.

\* \* \*

So our optimism is balanced based on we know the consumer is under pressure still. ***Our model will generate more customer traffic during the holiday season. Based on our conversations with vendors and how they're going to support products in the back half of the year, we think all the excitement's coming in the back half of the year from an industry standpoint,*** as well.

\* \* \*

<Q - Analyst>:

\* \* \*

So I guess the question I have is as we went through the quarter and we got closer to the traditionally stronger football season, and even maybe subsequent to the quarter's end, ***did you see an improving trend there in the TV category, particularly with some the new technologies now in the stores?***

<A - Brian J. Dunn, Chief Executive Officer>:

***Generally not. Generally, the overall TV industry has been relatively flat.*** I think that's partially as I said earlier, I think it's partially because the industry hasn't been very promotional in the first half and as Jim mentioned, we believe, in fact, we know that it's going to get more exciting promotionally in home theater in the second half. I think there's been a lot of pent-up demand both from a consumer point of view and from a manufacturer and retailer point of view to get some exciting promotions going and I think we're going to see more of that in the second half.

55.    The above statements made or authorized by Individual Defendants were improper because: (i) they knew the Company could not achieve its reported business outlook and aggressive guidance due to declining consumer demand for its products and weak sales results; (ii) they failed to disclose that the Company would have to significantly

manipulate its earnings to meet earnings forecasts including substantially cutting its SG&A and executing massive repurchases of its own stock to increase EPS; and (iii) the Company had no reasonable basis to make positive statements about its future growth and provide aggressive guidance in light of the fact that it knew declining demand and weak sales would adversely affect its revenue and earnings.

### THE TRUTH IS REVEALED

56.    On December 14, 2010, Best Buy issued a press release announcing its financial results for the fiscal 2011 third quarter ended November 27, 2010.  The results were astounding, as the Company reported revenues and earnings that were well-below analyst estimates, a 5% decline in comparable store sales attributed to low demand, and loss of market share.  As such, the Company reduced its previously reported EPS guidance of $3.55-$3.70 per share to $3.20-$3.40 per share.  Worse, the Company disclosed that its reduced EPS guidance included the favorable impact of approximately $1.1 billion of share repurchases made in fiscal year 2011 up to the third quarter.  Hence, without the repurchases, the Company's EPS forecast would have been an additional $0.12 per share lower.  The press release read as follows, in pertinent parts:

**Best Buy Reports Fiscal Third Quarter Diluted EPS of $0.54**

Best Buy Co., Inc. (NYSE:BBY), the world's leading retailer of consumer electronics, today reported net earnings of $217 million, or $0.54 per diluted share, for its fiscal third quarter ended November 27, 2010, compared with $227 million, or $0.53 per diluted share, for the prior-year period.

"I am grateful for the hard work and dedication of our employees in the start of the holiday shopping season," said Brian Dunn, CEO of Best Buy. "While sales were lower than we expected during the quarter, I'm pleased with our strong store execution, solid gross margin expansion and efforts to control costs. I'm confident that our employees will continue to deliver great

experiences that help our customers select the best gifts for their friends and family this holiday season."

\* \* \*

*During the third quarter of fiscal 2011, the company repurchased approximately $420 million, or 11 million shares of its common stock at an average price of $38.69 per share. For the first nine months of fiscal 2011, the company repurchased approximately $1.1 billion, or 31 million shares of its common stock at an average price of $36.68 per share.* The company estimates that the share repurchase completed fiscal year-to-date had an approximately $0.03 favorable impact to the fiscal third quarter's diluted EPS. The company also noted that it has $1.4 billion remaining capacity under its existing share repurchase authorization as of the end of the fiscal third quarter. On October 5th, 2010, the company paid a dividend of $0.15 per common share, or $60 million in the aggregate.

**Fiscal 2011 Guidance**

"Fiscal third quarter domestic sales were softer than we expected, but we were very pleased with the continued strong gross margin performance and actions to lower variable expenses," said Jim Muehlbauer, Best Buy's executive vice president of finance and CFO. *"Based on lower than expected sales and earnings in the fiscal third quarter, and given our current visibility to potential outcomes in the fiscal fourth quarter, we now expect annual earnings to be below our previous fiscal 2011 EPS guidance.* There remains a significant amount of business still ahead of us in the holiday selling season and we don't have complete visibility to how customers will behave over the next several weeks. However, our best view today is that *we now expect annual EPS in the range of $3.20 to $3.40."* The company noted that *this new guidance range includes the favorable impact of share repurchases made year-to-date through the end of the fiscal third quarter which approximates $0.12*.

57.     That same day, in an earnings conference call, defendants Dunn and Muehlbauer endeavored to explain the Company's suddenly meek business prospects that were touted merely three months ago in the Company's second quarter fiscal 2011 earnings disclosures. Defendants Dunn and Muehlbauer acknowledged slowing demand for its products were adversely affecting its results, and admitted that that the Company's "top line growth assumptions earlier in the year turned out to be too aggressive":

**Brian J. Dunn, Chief Executive Officer**

Our sales in the U.S, however, ***were lower than we expected for the quarter and as a result, earnings were less than we anticipated.***

\* \* \*

Here are the facts: Our forecast and the forecasts of the vendor community were looking for an improvement in the TV industry in the third quarter, supported by a more promotional environment and pent-up consumer demand for new technologies. While we did see sequential month-to-month improvement in our TV business, the quarterly results fell below our expectations. In fact, estimates are the TV market was down double-digits in value terms in the third quarter. ***We think this was driven by a weaker overall demand environment for TV*** along with slower adoption of new technologies.

\* \* \*

Next, I'd like to talk about mobile computing. ***The notebook market was weaker than we expected and we estimate the notebook market declined year-on-year.*** There were a number of factors driving this. The Windows 7 launch last year was more significant than we and the industry forecasted and we saw two main shifts occur in the tablet space; more overall customers migrating to tablets and customers waiting as they considered their purchase decisions on tablets versus netbooks and notebooks.

\* \* \*

***The gaming sector lagged our expectations. We did not perform as well on some of the new game titles as we had expected***, especially coming off a 20-month high in market share a year ago driven by Wii and PS3 hardware and title sales. We believe we are well positioned to grow this product segment because of our relationship with so many gaming enthusiasts.

\* \* \*

**James L. Muehlbauer, Executive Vice President – Finance and Chief Financial Officer**

\* \* \*

As you noticed in our release this morning, ***the single largest driver of our softer than expected performance in the quarter was the comparable store sales decline in the Domestic segment.*** So let's turn straight to the domestic sales story in the quarter.

- 38 -

Domestically, third quarter revenue decreased 3% from last year to $8.7 billion. ***The quarter saw a comparable store sales decline of 5% versus our expectation of flat to modest growth.***

\* \* \*

One of the inherent challenges of having a fiscal quarter that ends right after the Thanksgiving holiday is that we are right in the middle of the holiday selling season and only have partial visibility to customer behaviors. Based on the shortfall to sales and earnings experienced in the third quarter, combined with the current visibility we have to potential outcomes in the fourth quarter, ***we now expect annual diluted EPS in the range of $3.20 to $3.40 for fiscal 2011. This amount includes a roughly $0.12 impact of share repurchases made year-to-date through the end of the third fiscal quarter.***

I want to be clear that this ***reduction in our guidance is primarily driven by lower expectations of comparable store sales in the Domestic segment***. We continue to expect to see improved gross margin rates and strong control over variable expenses in the fourth quarter.

\* \* \*

<A - James L. Muehlbauer, Executive Vice President – Finance and Chief Financial Officer>:

What we're learning now as we've seen the customer play out, is that ***our top line growth assumptions earlier in the year turned out to be too aggressive based on the environment that we see for demand, specifically in the TV industry and the computing industry overall*** and we're getting the activity that we wanted to get out of the margin expansion overall.

### THE IMPROPER REPURCHASES

58.     While Individual Defendants made or allowed improper statements that had the effect of inflating the Company stock, defendants Dunn, Shulze, Kaplan, Paull, Tyabji, Higgins Victor, James, Rebolledo, Mikan, Vittecoq, Khosla, Caputo, Anderson, Lenzmeier, and Trestman authorized and caused the Company to conduct multiple repurchases of the its stock at these artificially inflated rates.  Despite knowing, or recklessly disregarding the fact that the value of the Company was artificially inflated due to its optimistic growth prospects

- 39 -

and aggressive guidance, these defendants caused the Company to materially overpay for its own stock through the repurchases detailed herein.

59.     On June 27, 2007, the Board authorized a stock repurchase program of up to $5.5 billion.  Pursuant to this share repurchase program, from April 4, 2010 to November 27, 2010, the Company engineered a series of massive repurchases of Best Buy stock.  In the first quarter of fiscal 2011 alone, defendants caused the Company to repurchase over $100 million of its own stock.  Then, in the second quarter of fiscal 2011, defendants effectuated a repurchase of approximately $600 million of the Company's stock.  Finally, in the third quarter of fiscal 2011, defendants directed a repurchase of approximately $420 million of Best Buy stock.  In total, Best Buy repurchased over thirty million shares of its stock at a whopping aggregate cost to the Company of over $1.1 billion  The following chart illustrates the average prices paid for the Company's common stock during the repurchase period:

| Period | Repurchased Shares | Average Price Per Share | Approximate Aggregate Cost |
|---|---|---|---|
| February 28, 2010 – April 3, 2010 | - | - | - |
| April 4, 2010 - May 1, 2010 | 803,700 | $46.21 | $37,138,977 |
| May 2, 2010 - May 29, 2010 | 1,734,100 | $42.40 | $73,525,840 |
| May 30, 2010 - July 3, 2010 | 4,739,100 | $35.68 | $169,091,088 |
| July 4, 2010 - July 31, 2010 | 4,826,000 | $34.71 | $167,510,460 |
| August 1, 2010 – August 28, 2010 | 7,720,400 | $33.43 | $258,092,972 |
| September 29, 2010 – October 2, 2010 | 5,708,000 | $34.92 | $199,323,360 |
| October 3, 2010 – October 30, 2010 | 2,838,700 | $42.16 | $119,679,592 |
| October 31, 2010 – November 27, 2010 | 2,361,000 | $43.61 | $102,963,210 |

- 40 -

| | | | |
|---|---|---|---|
| November 28, 2010 – January 1, 2011 | - | - | - |
| **TOTAL:** | **30,731,000** | **$36.68** | **$1,127,325,499** |

60. Under the Individual Defendants' purview, the Company bought back over $1.1 billion worth of its shares at a weighted average price of $36.68. As the previously artificially inflated Company stock precipitously dropped to represent the true value of Best Buy, the Company incurred real economic loss arising from the more than thirty million shares of Best Buy stock the Company repurchased at inflated prices authorized and implemented by the Individual Defendants.

### INSIDER SELLING

61. Individual Defendants' knowledge of the declining demand for Best Buy products and its inability to reach its aggressive guidance is also shown in Best Buy's officers' and directors' sales of personally-held stock. Individual Defendants were privy to adverse, non-public information which they exploited for their own benefit, to the exclusion of other shareholders, by selling their Company stockholdings before the truth came to light. While continuously making and allowing improper statements touting Best Buy's business prospects, and effectively concealing the extent of the declining demand for its products, certain officers and directors sold massive amounts of Company stock in order to capitalize on the Company's inflated stock price that they had helped create.

62. Combined, defendants Dunn, Kaplan, Lenzmeier, and Trestman sold over $11 million worth of their Company stock during the relevant period from the first improper statement made by defendants Dunn and Muehlbauer on March 25, 2010 to December 14,

2010, when the truth was revealed.  The following is a table showing the total sales that occurred during the relevant period:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| **DUNN** | 4/1/2010 | 13,848 | $42.73 | $591,765.20 |
|  |  | **13,848** |  | **$591,765.20** |
|  |  |  |  |  |
| **KAPLAN** | 4/26/2010 | 11,250 | $48.46 | $545,221.13 |
|  | 10/26/2010 | 11,250 | $42.87 | $482,268.38 |
|  |  | **22,500** |  | **1,027,489.50** |
|  |  |  |  |  |
| **LENZMEIER** | 4/23/2010 | 180,000 | $48.05 | $8,649,108.00 |
|  |  | **180,000** |  | **$8,649,108.00** |
|  |  |  |  |  |
| **TRESTMAN** | 4/21/2010 | 16,835 | $46.00 | $774,468.92 |
|  |  | **16,835** |  | **$774,468.92** |
|  |  |  |  |  |
| **TOTAL** |  | **233,183** |  | **$11,042,831.62** |

### DAMAGES TO BEST BUY

63.    As a result of the Individual Defendants' improprieties, Best Buy disseminated improper statements.  These improper statements have devastated Best Buy's credibility as reflected by the Company's over $6.3 billion market capitalization decline.

64.    Best Buy also faces damages from securities class actions brought by investors against defendants Best Buy, Dunn, and Muehlbauer.  Among other things, the class action complaints allege false and misleading statements and material omissions made by the defendants concerning the Company's financial conditions and business prospects.  Accordingly, the Company has and will incur costs in investigating and defending Best Buy and certain officers and directors in the class action lawsuits, in addition to potentially millions of dollars in settlement or to satisfy an adverse judgment.

65. Further, as a direct and proximate result of the Individual Defendants' actions, Best Buy has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a) costs incurred in initiating a potential internal review or an internal investigation into the improprieties engaged in by defendants;

(b) costs incurred from repurchasing approximately $1.1 billion of Best Buy stock at artificially inflated prices; and

(c) costs incurred from compensation and benefits paid to the defendants who have breached their duties to Best Buy.

66. Moreover, these actions have irreparably damaged Best Buy's corporate image and goodwill. For at least the foreseeable future, Best Buy will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Best Buy's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

67. Plaintiff brings this action derivatively in the right and for the benefit of Best Buy to redress injuries suffered, and to be suffered, by Best Buy as a direct result of violations of federal laws, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by Individual Defendants. Best Buy is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

- 43 -

68.    Plaintiff will adequately and fairly represent the interests of Best Buy in enforcing and prosecuting its rights.

69.    Plaintiff is a Best Buy shareholder, was a shareholder of Best Buy at the time of the wrongdoing complained, and has continuously been a shareholder of Best Buy.

70.    The current Board of Best Buy consists of the following eleven individuals: defendants Dunn, Schulze, Paull, Tyabji, Higgins Victor, James, Rebolledo, Mikan, Vittecoq, Khosla, and Caputo.  Plaintiff has not made any demand on the Board because such a demand would be a futile and useless act, particularly for the reasons stated below.

**Demand Is Excused as to the Board Because the Company's Repurchase of Its Stock Was Not a Valid Exercise of Business Judgment**

71.    Defendants Dunn, Schulze, Paull, Tyabji, Higgins Victor, James, Rebolledo, Mikan, Vittecoq, Khosla, and Caputo breached their fiduciary duty of care by authorizing and permitting the inexplicable repurchase of over $1.1 billion worth of the Company's stock at artificially inflated prices.  At the time of the repurchase authorizations, defendants Dunn, Schulze, Paull, Tyabji, Higgins Victor, James, Rebolledo, Mikan, Vittecoq, Khosla, and Caputo acted with at least gross negligence by causing the Company to engage in a series of repurchases of its own stock at a time they should have known that the Company's stock price was inflated as a result of the improper statements detailed herein.  Defendants Dunn, Schulze, Paull, Tyabji, Higgins Victor, James, Rebolledo, Mikan, Vittecoq, Khosla, and Caputo's decision to repurchase the Company's stock was therefore, not the result of their valid business judgment.  Accordingly, demand upon defendants Dunn, Schulze, Paull, Tyabji, Higgins Victor, James, Rebolledo, Mikan, Vittecoq, Khosla, and Caputo is excused.

**Demand Is Excused Because Defendants Dunn, Schulze, Paull, Tyabji, Higgins Victor, James, Rebolledo, Mikan, Vittecoq, Khosla, and Caputo Face a Substantial Likelihood of Liability for Their Misconduct**

72.    Demand is futile and excused because all of the Board members are not disinterested because they face a substantial likelihood of liability for the wrongdoing alleged herein.

73.    Defendant Dunn faces a substantial likelihood of liability for his violation of section 10(b) of the Exchange Act. Dunn, as CEO of Best Buy, was ultimately responsible for the Company's operations, financial statements, and internal controls. However, in complete abdication of his fiduciary duties, Dunn knowingly, recklessly, or was at least extremely negligent in making the improper statements regarding the Company's financial results and business prospects. In particular, Dunn knowingly, recklessly, or was at least grossly negligent in presenting the Company's aggressive business outlook notwithstanding the decline in demand and weak sales figures for Best Buy products. As such, Dunn had no reasonable basis to present aggressive guidance and business outlook.

74.    Dunn also knowingly, recklessly, or was at least extremely negligent in causing the Company to repurchase over $1.1 billion of its own stock at prices he knew were inflated due to the misinformation that he disseminated concerning the Company's business forecasts. As such, Dunn breached his fiduciary duties. Accordingly, because Dunn faces a substantial likelihood of liability for violations of federal securities law, demand upon him is futile.

75.    Defendants Dunn, Schulze, Paull, Tyabji, Higgins Victor, James, Rebolledo, Mikan, Vittecoq, Khosla, and Caputo face a substantial likelihood of liability for violation of section 20(a) of the Exchange Act because they had the power and ability to control and

prevent the dissemination of the foregoing false and misleading statements. Notwithstanding, these defendants allowed the false and misleading statements to be disseminated into the market, which had the effect of artificially inflating the value of the Company's stock. These defendants' failure to exercise proper control over the Company's public disclosures further caused the Company repurchase over $1.1 billion of its own stock at inflated prices. Because defendants Dunn, Schulze, Paull, Tyabji, Higgins Victor, James, Rebolledo, Mikan, Vittecoq, Khosla, and Caputo face a substantial likelihood of liability for violations of federal securities law, demand upon them is futile.

76.     Defendants Dunn, Schulze, Paull, Tyabji, Higgins Victor, James, Rebolledo, Mikan, Vittecoq, Khosla, and Caputo, face a substantial likelihood of liability due to their breaches of their duty of loyalty and wasting the Company's assets in authorizing and permitting the inexplicable repurchase of over $1.1 billion worth of the Company's stock at artificially inflated prices. At the time of the repurchase authorizations, defendants Dunn, Schulze, Paull, Tyabji, Higgins Victor, James, Rebolledo, Mikan, Vittecoq, Khosla, and Caputo either knew, or in reckless disregard for their duties did not know, that the Company's stock price was inflated as a result of the improper statements detailed herein. Accordingly, defendants Dunn, Schulze, Paull, Tyabji, Higgins Victor, James, Rebolledo, Mikan, Vittecoq, Khosla, and Caputo face a substantial likelihood of liability for breaching their duty of loyalty and wasting corporate assets, raising a reasonable doubt about their ability to impartially consider a demand.

77.     Defendants Mikan, Paull, Tyabji, and Vittecoq were members of the Audit Committee. As members of the Audit Committee during the relevant period, these Audit

Committee Defendants had additional and heightened responsibility to review the Company's interim financial statements, earnings press releases, and its earnings guidance. Specifically, the Audit Committee Defendants had a duty and responsibility to oversee "the integrity of the Company's financial statements and financial reporting processes." Thus, the Audit Committee Defendants were responsible for knowingly or recklessly causing the Company to issue a series of improper statements regarding the financial condition and business prospects of the Company, and issuing improper guidance that defendants knew the Company could not meet in light of the decrease in demand for its products. Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein. Thus, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

78.     Defendants Dunn, Schulze, Paull, Tyabji, Higgins Victor, James, Rebolledo, Mikan, Vittecoq, Khosla, and Caputo knowingly, or recklessly, caused Best Buy to make improper statements in its press releases and earnings conference calls. In particular, these defendants made improper statements that: (i) failed to disclose to investors that the Company could not achieve its reported business outlook and aggressive guidance due to declining consumer demand for its products and weak sales results; (ii) effectively concealed the fact that the Company would have to significantly manipulate its earnings to meet earnings forecasts including substantially cutting its SG&A and executing massive repurchases of its own stock to increase EPS; and (iii) failed to disclose that they had no reasonable basis to make positive statements about the Company's future growth and provide

aggressive guidance in light of the declining consumer demand and weak sales.  Because defendants Dunn, Schulze, Paull, Tyabji, Higgins Victor, James, Rebolledo, Mikan, Vittecoq, Khosla, and Caputo face a substantial likelihood of liability for breaching their fiduciary duties of loyalty, demand upon them is futile.

79.     Defendant Dunn also faces a substantial likelihood of liability for breaching his fiduciary duties of loyalty and good faith by selling his personally-held shares of the Company's stock for over $591,000 in proceeds while Best Buy's stock price was artificially inflated.  Best Buy's stock price was inflated due to the Individual Defendants' failure to disclose the following material information concerning the Company, which was known to Dunn: (i) the Company's business outlook and aggressive guidance could not be achieved due to the decline in consumer demand; (ii) the Company would have to significantly manipulate its earnings to meet earnings forecasts including substantially cutting its SG&A and executing massive repurchase of its own stock to increase EPS; and (iii) the Company had no reasonable basis to make positive statements about its future growth and provide aggressive guidance in light of the fact that it knew declining demand and weak sales would adversely affect its revenue and earnings.  Because Dunn faces a substantial likelihood of liability for breaching his fiduciary duties of loyalty and good faith, demand upon him is futile.

80.     Defendants Dunn, Schulze, Paull, Tyabji, Higgins Victor, James, Rebolledo, Mikan, Vittecoq, Khosla, and Caputo as members of the Board, were and are subject to the Code.  The Code went well beyond the basic fiduciary duties required by applicable laws, rules, and regulations.  The Code required that defendants Dunn, Schulze, Paull, Tyabji,

Higgins Victor, James, Rebolledo, Mikan, Vittecoq, Khosla, and Caputo "[a]ppropriately manage and safeguard Company's assets."  Further, the Code required these defendants to "[f]ully and fairly disclose material financial information," and expressly prohibited trading on "material, nonpublic information."  Defendants Dunn, Schulze, Paull, Tyabji, Higgins Victor, James, Rebolledo, Mikan, Vittecoq, Khosla, and Caputo failed to do this, which violated the Code.  As alleged herein, these defendants made improper disclosures concerning the Company's business outlook and forward guidance and wasted the Company's assets by authorizing the repurchase of over $1.1 billion of the Company's stock at inflated prices.  Defendant Dunn was further in contravention of the Code by trading over $591,000 of his personally-owned Company stock at prices he helped inflate through his improper statements.  As such, defendants Dunn, Schulze, Paull, Tyabji, Higgins Victor, James, Rebolledo, Mikan, Vittecoq, Khosla, and Caputo face a substantial likelihood of liability for breaching the Code, and demand upon them is futile.

**Demand Is Excused Because Defendant Schulze Is Not Independent or Disinterested**

81.     Defendant Schulze, as clearly delineated in the Company's proxy, is neither independent nor disinterested according to SEC and New York Stock Exchange standards. In fact, defendant Schulze and his family members have received lucrative perquisites and been extended every privilege at the expense of the Company.  For instance, in fiscal year 2011, the Company paid defendant Schulze approximately $1 million to lease two Best Buy stores owned by him.  The Company has engaged in further lucrative transactions with entities owned by defendant Schulze and his family members.  In fiscal year 2011, the Company entered into a leased airplanes and chartered aircraft services from entities owned

by the Richard M. Schulze Revocable Trust, under a trust agreement, of which defendant Schulze is a trustee. Accordingly, the Company paid approximately $854,000 to defendant Schulze's entities for use of the airplanes. Moreover, with the approval of the Board, the Company purchased store fixtures from Phoenix Fixtures, Inc., a company owned by defendant Schulze's brother, for a whopping $9.7 million during fiscal year 2011. Finally, defendant Schulze's daughter serves as the Founder, Chairperson, and CEO of the Best Buy Children's Foundation, and is employed by the Company as its Vice President for which she received $298,599 in total cash compensation in addition to 11,550 shares of Best Buy stock in option awards. Accordingly, defendant Schulze and his family members are dependent and beholden to defendant Dunn and the entire Board for their past, present, and future pecuniary benefits and remunerations, and therein, defendant Schulze is hopelessly conflicted and incapable of exercising independent and disinterested judgment as to any demand to bring litigation against them. Demand is futile as to defendant Schulze.

82. The acts complained of constitute violations of the fiduciary duties owed by Best Buy's officers and directors and are incapable of ratification.

83. Best Buy has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein. Despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the Individual Defendants and the current Board have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct to attempt to recover for Best Buy any part of the damages Best Buy suffered and will suffer thereby. The Board's stubborn failure to investigate, correct, and commence legal action against those responsible for the misconduct alleged herein in the

face of heavy media and investor scrutiny on the matter, demonstrates that the Board is hopelessly incapable of independently addressing any legitimate demand.

84.     If Best Buy's current and past officers and directors are protected against personal liability for their acts of mismanagement and breach of fiduciary duty alleged in this Complaint by directors and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the stockholders of Best Buy.  However, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by Best Buy against these defendants, known as the "insured versus insured exclusion."  As a result, if these directors were to cause Best Buy to sue themselves or certain of the officers of Best Buy, there would be no directors and officers' insurance protection and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  If there is no directors and officers' liability insurance, then the current directors will not cause Best Buy to sue the defendants named herein, since they will face a large uninsured liability and lose the ability to recover for the Company from the insurance.

85.     Plaintiff has not made any demand on the other shareholders of Best Buy to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)     Best Buy is a publicly held company with over 373 million shares outstanding as of June 28, 2011, and thousands of shareholders;

(b)      making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders; and

(c)      making demand on all shareholders would force plaintiff to incur excessive expenses, assuming all shareholders could be individually identified.

## COUNT I

### Against Defendants Dunn and Muehlbauer For Violation of Section10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder

86.      Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

87.      Defendants Dunn and Muehlbauer knowingly or with extreme recklessness made and caused the publication of misleading statements regarding the financial health of the Company, its business and growth prospects, and its forward guidance.

88.      The wrongful conduct alleged herein was continuous, connected, and on-going during the relevant period from the first improper statement on March 25, 2010 to December 14, 2010, when the truth was revealed.  Defendants Dunn and Muehlbauer's misconduct resulted in continuous, connected, and on-going harm to the Company.

89.      Best Buy repurchased approximately thirty million shares of its own stock at a cost to the Company of approximately $1.1 billion, at artificially inflated prices due to their false and misleading statements.

90.      Defendants Dunn and Muehlbauer violated section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

(a)      employed devices, schemes, and artifices to defraud;

(b)      made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)      engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Best Buy stock during the relevant period.

91.    Best Buy has suffered damages by repurchasing the Company's stock at prices defendants Dunn and Muehlbauer knew were artificially inflated as a result of their false and misleading statements.  But for these defendants' misconduct, the Company would not have purchased its stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by these defendants' misleading statements.

## COUNT II

### Against the Director Defendants for Violation of
### Section 20(a) of the Exchange Act

92.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

93.    The wrongful conduct alleged herein was continuous, connected, and on-going during the relevant period from the first improper statement on March 25, 2010 to December 14, 2010, when the truth was revealed.  The Director Defendants' misconduct resulted in continuous, connected, and on-going harm to the Company.

94.    The Director Defendants had the power and/or ability to, and did, directly or indirectly control or influence the Company's general affairs, including the content of public statements disseminated by Best Buy and the timing and amount of stock repurchases, and

had the power and/or ability directly or indirectly to control or influence defendants Dunn and Muehlbauer in connection with the specific conduct that violated §10(b) of the Exchange Act and SEC Rule 10b-5 as alleged above.

95.    Each of the Director Defendants is jointly and severally liable under §20(a) of the Exchange Act to the same extent as defendants Dunn and Muehlbauer for the primary violations of §10(b) and Rule 10b-5 promulgated thereunder, as set forth herein.  The Director Defendants did not act in good faith.

## COUNT III

### For Breach of Fiduciary Duty Against the Individual Defendants

96.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

97.    As alleged in detail herein, Individual Defendants by reason of their positions as officers and directors of Best Buy and because of their ability to control the business and corporate affairs of Best Buy, owed the Company fiduciary obligations of due care and loyalty, and were and are required to use their utmost ability to control and manage Best Buy in a fair, just, honest, and equitable manner.

98.    Defendants Dunn and Muehlbauer violated their duty of care by making improper statements in the Company's press releases and in conference calls, and otherwise disseminated to the public.  Defendants Dunn and Muehlbauer either knew, were reckless, or were grossly negligent in not knowing and making improper statements that concealed: (i) the Company's business outlook and aggressive guidance could not be achieved due to the decline in consumer demand; (ii) the Company would have to significantly manipulate its

earnings to meet earnings forecasts including substantially cutting its SG&A and executing massive repurchase of its own stock to increase EPS; (iii) the Company had no reasonable basis to make positive statements about the Company's future growth and provide aggressive guidance in light of the fact that they knew declining demand and weak sales would adversely affect its revenue and earnings. Accordingly, defendants Dunn and Muehlbauer breached their duty of care, good faith, and loyalty.

99.     The Director Defendants of the Company owed Best Buy the highest duty of loyalty. These defendants breached their duty of loyalty by making or approving improper statements regarding the financial health and business prospects of the Company. The Director Defendants made or approved improper statements that: (i) failed to disclose the impact of the declining demand weak sales on the Company's business outlook and forward guidance; (ii) reported aggressive earnings guidance while failing to disclose that those earnings results and outlook were unsustainable without implementing drastic cuts to its SG&A and executing massive repurchase of its own stock to increase EPS; (iii) failed to disclose that it had no reasonable basis to make such positive statements regarding the Company's financial health, growth prospects, and provide aggressive guidance. Further, the Director Defendants breached their duty of loyalty by authorizing the Company's repurchase of its own securities at prices they knew, or in reckless disregard of their duties did not know, were artificially inflated. Accordingly, the Director Defendants breached their duty of good faith and loyalty.

100.     The Audit Committee Defendants breached their fiduciary duty of loyalty by knowingly or recklessly allowing the Company to make improper statements in its press

releases and earnings conference calls concerning the Company's financial health, business prospects, and forward guidance. Additionally, this constituted a violation of the duties of the members of the Audit Committee under its Charter.

101. The Insider Selling Defendants breached their duty of loyalty by selling over $11 million of their personally-held Best Buy stock on the basis of their knowledge of the improper information described above before that information was revealed to the Company's shareholders. The information described above was proprietary, non-public information concerning the Company's future business prospects. It was a proprietary asset belonging to the Company, which these Insider Selling Defendants used for their own benefit when they sold Best Buy stock.

102. As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

103. Plaintiff, on behalf of Best Buy, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Waste of Corporate Assets

104. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

105. The Individual Defendants wasted Best Buy's corporate assets by authorizing and effectuating the repurchase of over $1.1 billion of the Company's stock at prices they knew, or recklessly were unaware of, were artificially inflated. The Directors Defendants

wrongfully authorized these repurchases while issuing improper statements that had the effect of inflating the value of the Company's stock.

106.    The Individual Defendants also wasted corporate assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty, exposing it to civil liability, and causing it to incur potentially millions of dollars in legal costs.

107.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

108.    Plaintiff, on behalf of Best Buy, has no adequate remedy at law.

## COUNT V

### Against the Individual Defendants for Unjust Enrichment

109.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

110.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Best Buy.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Best Buy.

111.    Defendants Dunn, Kaplan, Lenzmeier, and Trestman sold Best Buy stock while in possession of material, adverse non-public information that artificially inflated the price of Best Buy stock.  As a result, these Insider Selling Defendants profited from their misconduct and were unjustly enriched through their exploitation of material and adverse inside information.

112.    Plaintiff, as a shareholder and representative of Best Buy, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

113.    Plaintiff, on behalf of Best Buy, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands for a judgment as follows:

A.    Against all the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.    Directing Best Buy to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Best Buy and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

1.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.    a provision to permit the shareholders of Best Buy to nominate at least three candidates for election to the Board;

      3.    a proposal to strengthen Best Buy's oversight of its disclosure procedures; and

      4.    a provision to control insider selling;

C.    Extraordinary equitable and/or injunctive relief as permitted by law and equity provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting defendants' assets so as to assure that plaintiff on behalf of Best Buy has an effective remedy;

D.    Awarding to Best Buy restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.    Awarding to plaintiff reasonable attorneys' fees, consultant and expert fees, costs, and expenses; and

F.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: July __, 2011          ANDERSON, HELEGEN, DAVIS
                              & NISSEN, PA

                              s/Henry M. Helgen, III
                              Henry M. Helgen, III (#151075)
                              Amanda R. Cefalu (#309436)
                              150 South Fifth Street, Suite 3100
                              Minneapolis, MN 55402
                              Telephone: (612) 435-6363
                              Facsimile: (612) 435-6379
                              hmh@andersonhelgen.com
                              arc@andersonhelgen.com

                              ROBBINS UMEDA LLP
                              BRIAN J. ROBBINS
                              FELIPE J. ARROYO

SHANE P. SANDERS
GINA STASSI
600 B Street, Suite 1900
San Diego, CA 92101
Telephone:  (619) 525-3990
Facsimile:  (619) 525-3991

THE WRIGHT LAW OFFICE, P.A.
WILLIAM C. WRIGHT
301 Clematis Street, Suite 3000
West Palm Beach, FL 33401
Telephone: (561) 514-0904
Facsimile:  (561) 514-0905

Attorneys for Plaintiff

625375